**F. BUDDIE CONTRACTING, LTD., et al., Plaintiffs,**

v.

**CUYAHOGA COMMUNITY COLLEGE DISTRICT, et al., Defendants.**

No. 1:96CV2136.

United States District Court, N.D. Ohio, Eastern Division.

Oct. 21, 1998.

Timothy A. Marcovy, Malcolm S. Young, Willacy & Lopresti, Cleveland, OH, for Plaintiffs.

Thomas L. Colaluca, Johnson & Angelo, Cleveland, OH, for Defendants.

## MEMORANDUM OPINION AND ORDER

PERELMAN, United States Magistrate Judge.

In this action filed pursuant to 42 U.S.C. § 1983, Plaintiff, F. Buddie Contracting, Ltd.,[1] challenges the constitutionality of Defendants' minority and female business enterprise set-aside policies for awarding construction contracts. Defendants are the Cuyahoga Community College District (hereinafter CCC) and the individual members of CCC's Board of Trustees, (hereinafter Board), CCC's President, Executive Vice President of Finance and Business, and its Assistant Vice President of Operations, in their individual and official capacities.

On January 27, 1994, the Board of Trustees of CCC enacted its amended "Minority

---

1. Also named as Plaintiffs are Frank Buddie, Michael Buddie, Robert Kane and Richard Szabo, all partners of F. Buddie Contracting. For purposes of this motion this Court will refer to Plaintiffs in the singular.

Business Enterprise Program Policy"[2] which provides that a prime contractor must award 10% of the value of a construction contract with CCC to Minority Business Enterprise (hereinafter MBE) subcontractors unless that requirement is waived, at CCC's discretion, upon a showing that the prime contractor, after a good faith effort, was unable to acquire the requisite MBE subcontractor.[3] An MBE is defined in the policy as a business owned or controlled by a member of one or more of the following groups: Blacks. Native Americans, Hispanics, and Orientals.

On July 1, 1993, CCC enacted a Female Business Enterprise Program Policy[4] in which a prime contractor is required to award 25% of the total value of a construction contract with CCC to Female Business Enterprises (hereinafter FBEs). No waiver provision was included in that policy Neither this policy nor the MBE policy incorporated durational or geographic limitations.

CCC's MBE policy was patterned after Ohio's minority set aside program set forth in O.R.C. § 123.151 which provides that: "In the case of contracts specified in division (A) of section 153.50 of the Revised Code [for bids on construction contracts], the total value of subcontracts awarded to and materials and services purchased from minority businesses shall be at least ten per cent of the total value of the contract, wherever possible and whenever the contractor awards subcontracts or purchases materials or services." O.R.C. § 123.151(C)(2)(a).

The State of Ohio directed community college districts to enact similar policies through O.R.C. § 3354.161, effective July 1, 1993, which provides in pertinent part:

> (A) In awarding contracts for a work of improvement pursuant to the official plan of a community college district, the board of trustees of the community college district shall comply with the percentage requirements of division (C)(1) of section 123.151 [123.15.1] of the Revised Code.

Any contract so awarded shall require the contractor to comply with the requirements of division (C)(2)(a) of section 123.151 [123.15.1] of the Revised Code in awarding subcontracts and in purchasing services and materials under that contract. If, after making a good faith effort, a contractor is unable to comply with the requirements of division (C)(2)(a) of section 123.151 [123.15.1] of the Revised Code because he is unable to locate minority business enterprises available to accept subcontracts or from whom he may purchase materials or services, the contractor may apply to the board of trustees of the district for a waiver or modification of the requirements. If the board of trustees of the district determines that the contractor made a good faith effort to locate and use minority business enterprises but was unable to do so, it may waive the requirements of division (C)(2)(a) of section 123.151 [123.15.1] of the Revised Code, authorize a reduction in the total value of the contract required to be designated to minority business enterprises.

The undisputed facts pertinent to this action are simple. In April, 1996, Defendants published a "Notice to Bidders" seeking bids from prime contractors on a construction contract described as "Plaza Level Planter Repairs–Project # 4034." Plaintiff's bid of $ 249,607.00 on the Project was the lowest bid. It designated 3.7% of the total value of the contract as going to MBE subcontractors and 21% going to FBE subcontractors. Despite Plaintiff's application for a waiver its bid was rejected due to the failure to comply with the MBE participation policy.[5] The contract was then awarded to the second lowest bidder.

Plaintiff filed suit challenging the constitutionality of O.R.C. §§ 3354.161, 123.151(C)(1), (C)(2)(a), and 122.71(E)(1) and CCC's affirmative action policy with respect

2. The original policy was issued in 1982.

3. Despite this formal waiver provision it appears that the Board adopted an informal rule against issuing waivers.

4. The policy was assertedly enacted pursuant to CCC's general powers as conferred by O.R.C. § 3354.09.

5. There is no dispute that Plaintiff's bid was not rejected by reason of failure to meet the 25% FBE participation policy.

to both the MBE and FBE provisions, and seeking damages in the form of the value of the contract as well as declaratory and injunctive relief. Because the State of Ohio is not a named Defendant this Court cannot render declaratory judgment or an injunction with respect to these State statutes, and the action is being considered only insofar as it challenges the CCC policies.

Both parties have moved for partial summary judgment, with Plaintiff seeking judgment on liability only and Defendant seeking judgment on behalf of the board members and CCC officers in their individual capacities on qualified immunity grounds. This opinion addresses only Plaintiff's motion for partial summary judgment.

The disposition of a motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides for the granting of such motion where, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court succinctly stated the standard for granting a motion for summary judgment as follows:

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Id.* at 322, 106 S.Ct. 2548.

Such showing by the nonmovant must consist of more than a mere "scintilla" of evidence, or the hope that the court will disbelieve the movant's denial of a disputed fact. The non-moving party must present plausible evidence in support of the facts which are deemed material under the substantive law applicable to the cause of action. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (discussing the "new era" of summary judgment practice established in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp.*, 477 U.S. at 317, 106 S.Ct. 2548; *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Although the court's function under such a motion is to determine whether a genuine issue of material fact exists, as opposed to endeavoring to resolve any such factual issues. *Tee–Pak Inc. v. St. Regis Paper Co.*, 491 F.2d 1193 (6th Cir.1974), the court has discretion in weighing the evidence offered by the non-moving party, considered in light of the record as a whole, to determine whether that party's evidence does "more than simply show that there is some metaphysical doubt as to the material facts" or whether it demonstrates that the non-moving party's claims are "implausible." *Street.* 886 F.2d at 1479–1480. Further, in making that determination the court has no duty to independently search the record for the existence of genuine issues of material fact. *Id.* at 1479.

Plaintiff premises its challenge upon the Equal Protection Clause of the Fourteenth Amendment which provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws," and has as its central purpose the prevention of purposeful discrimination by the State between individuals on the basis of race. *Shaw v. Reno*, 509 U.S. 630, 642, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).

In order to place the parties' arguments in their proper perspective it is helpful to look at a series of United States Supreme Court cases which illustrate the historical background of affirmative action, as well as the concomitant evolution of Sixth Circuit law in the area.

The first of these cases is *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) in which the Supreme Court considered Congress' power to enact legislation with the purpose of advancing the economic opportunities of minority businesses in the area of public works projects. The legislation at issue required that before grants could be awarded for public works the applicant must assure the Secretary of Commerce that at least 10% of the value of the

grant would go to minority businesses. The Court, although unable to agree on a majority opinion, found that Congress derived the power to enact such legislation, at least in part, from § 5 of the Fourteenth Amendment which grants Congress the power "to enforce, by appropriate legislation" the equal protection clause of the Fourteenth Amendment *Id.* at 476, 100 S.Ct. 2758.[6] In the opinion announced by Chief Justice Burger and joined by Justices While and Powell the Court determined, without explicitly stating the standard under which it reviewed the case, that it was sufficient to base the need for such legislation largely upon findings of discrimination made in connection with previous congressional legislation.[7]

The Sixth Circuit interpreted and relied on *Fullilove* in *Ohio Contractors Association v. Keip,* 713 F.2d 167 (6th Cir.1983) in rejecting a challenge to Ohio's MBE act. O.R.C. § 123.151(C)(2)(b) as enacted in 1980, which provided that a prime contractor on a state contract must "award subcontracts totaling no less than five percent of the total value of the contract to [MBEs] ... and that the total value of both the materials purchased from [MBEs] ... and of the subcontracts awarded, to the extent that it subcontracts work, to such [MBEs] will equal at least seven percent of the total value of the contract...."

With regard to the factual justification for the legislation the *Keip* court concluded that despite the lack of formal findings by the Ohio legislature of past discrimination in state construction contracts it was apparent that the legislature was aware of the decision in *Ethridge v. Rhodes,* 268 F.Supp. 83 (S.D.Ohio 1967), and an unpublished 1979 decision out of Franklin County, Ohio, in which those courts found that the state had been "a joint participant" in the exclusion of minority businesses from work on public construction projects. The court also noted the existence of a task force report covering the years 1975–1977 which showed that although minority businesses constituted 7% of all Ohio businesses they received less than 0.5% of state purchase contracts.[8] Finally, the court noted that a study showed that from 1959 to 1975 the state paid $1.14 billion in general construction contracts but that only 0.24% of that money went to minority businesses. The court found that against this "backdrop" of racial discrimination and in light of the then-recent decision in *Fullilove* there was a sufficient factual basis for a determination that there was a need for remedial legislation.

The court went on to hold that the state's power to remedy its own past discrimination under § 1 of the Fourteenth Amendment was equivalent to the power of Congress to enforce the Fifth Amendment equal protection clause against the States under § 5 of the Fourteenth Amendment. *Keip,* 713 F.2d at 172 ("When a state legislature takes steps in compliance with the equal protection clause it is acting in the same capacity as that of Congress in adopting legislation to implement the equal protection component of the Fifth Amendment's due process clause."). Finding that the State had the power to address the "compelling" governmental interest in remedying historical racial discrimination the court went on to address the method used by the legislature. In so doing, the court rejected a statistical comparison between the type of construction work generally contracted for by the state and the

---

6. The Court stated in regard to Congress' powers to enforce the Fourteenth Amendment: "in no organ of government, state or federal does there repose a more comprehensive remedial power than in the Congress expressly charged by the Constitution with competence and authority to enforce equal protection guarantees. Congress not only may induce voluntary action to assure compliance with existing federal statutory or constitutional antidiscrimination provisions, but also, where Congress has authority to declare certain conduct unlawful, it may, as here, authorize and induce state action to avoid such conduct." *Fullilove,* at 483–84, 100 S.Ct. 2758.

7. In his separate opinion Justice Powell expressed his belief that a strict scrutiny standard applied to all cases of race classification. Justices Marshall, Brennan, and Blackmun agreed on a lesser standard to be applied in benign discrimination cases, opining that legislation should be upheld if it serves an "important" purpose and is "substantially related" to achievement of its goals.

8. The court noted that the 0.5% figure related to the department of transportation but concluded that it was indicative of state contracting policies in general.

number of MBEs receiving those contracts, looking to a broader comparison between all types of construction contracts and the MBEs obtaining them. The court found that while the rejected comparison indicated that under the set-aside program MBEs received more than their fair share of the contracts the broader comparison showed continued disparity between the number of MBEs which should receive contracts and those that did.

Addressing the contention that the act was overbroad because it included Hispanics. Orientals, and American Indians about whom there were no studies concerning past discrimination the court found that the fact that all and/or specific MBEs were not required to demonstrate that they had actually suffered from discrimination did not render the act unconstitutional because the previous cases had found discrimination against "minorities" in general, not just African–Americans.

Finally, the court, again relying on *Fullilove*, held that the State was not required to find the least restrictive method of remedying past discrimination but was free to adopt such legislation as it saw fit and the method chosen by the legislature was "reasonably calculated" to aid MBEs.

After *Keip* was decided the Supreme Court came down with the decision in *Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) finding, again with a plurality opinion that a lay-off plan which favored minority teachers in the Jackson Board of Education violated equal protection. Four Justices advocated application of a strict serutiny standard which required a determination of whether there was a "compelling interest" in the lay-off policy, stating that "the Court has insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination." *Id.* at 274, 106 S.Ct. 1842. Moreover, benign intentions on the part of the policy maker to remedy society's history of racial discrimination were deemed inadequate to justify an affirmative action program which was not shown to redress past discrimination on the part of the governmental entiry implementing such program *Id.* The Court held that in order to justify its racial classification the Board of Education must have had a "strong basis in evidence for its conclusion that remedial action was necessary" *Id.* at 278, 106 S.Ct. 1842. Without expressly deciding whether there existed past discrimination in teacher lay-offs the Court found that the remedy employed by the Board was not narrowly tailored, stating that

> The term "narrowly tailored," so frequently used in our cases, has acquired a secondary meaning. More specifically, as commentators have indicated, the term may be used to require consideration of whether lawful alternative and less restrictive means could have been used...[T]he classification at issue must "fit" with greater precision than any alternative means.

*Id.* at 279 n. 6, 106 S.Ct. 1842. In dictum the Court also noted that the Board's definition of "minority" to include Orientals, American Indians, and Hispanics was overbroad as there was no evidence of past discrimination against those groups. *Id.* at 284 n. 13, 106 S.Ct. 1842.

In *United States v. Paradise*, 480 U.S. 149, 171, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) the Court clarified its definition of "narrowly tailored," citing the following factors to be considered in the determination of that prong of the strict scrutiny test:

> the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties.

The Sixth Circuit reexamined its treatment of affirmative action plans in *Michigan Road Builders Association Inc. v. Milliken*, 834 F.2d 583 (6th Cir.1987), *affirmed*, 489 U.S. 1061, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989) specifically noting that its previous decision in *Keip* applied a "relaxed" standard of review in which it required that "affirmative action plans be a 'reasonable' means of furthering a 'significant' governmental interest rather than a 'narrowly tailored' or 'neces-

sary' means of furthering a 'compelling' governmental interest." *Id* at 587.

In *Milliken* the plaintiffs attacked Michigan's set-aside program, similar to the one at bar which provided that each state department must award 7% of its expenditures of construction goods and services to MBEs and 5% to FBEs. "Minority" was defined as a person who is black hispanic oriental, eskimo, or American Indian.

The court began its analysis by looking at whether the State's set-aside program was designed to remedy *its own* history of race discrimination and found that the defendants' reliance on "certain conclusory historical resumes of unrelated legislative enactments and proposed enactments, executive reports, and a state funded private study conducted in 1974" constituted an insufficient factual basis for its conclusion that there was such past discrimination. *Id.* at 590.

Specifically, the legislative enactments relied on by the defendants were found to be designed to advance the cause of small businesses in general in order to increase competition. That many minority owned businesses were small and would benefit from the legislation was incidental to that purpose. With respect to the state-commissioned study the court noted that the failure of the state to maintain records concerning minority procurement in state contracts prevented a significant enough sampling of minority businesses qualified for those contracts to create meaningful statistics. Moreover, the study revealed that, at most, MBEs were at a disadvantage due to societal discrimination which prevented them from developing their businesses with the same rapidity as nonminority businesses. There was, however, no evidence of actual discrimination on the part of the state which could justify a race conscious remedy.

The Supreme Court again entered the fray in *City of Richmond v. J.A. Croson Company,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), wherein the plaintiff challenged a Minority Business Utilization Plan which required prime contractors to award thirty percent of the value of the contract with the city to MBEs. Waivers were available at the discretion of the City for prime contractors who

failed in their good faith effort to comply with the MBE goal. The set-aside plan, which had no geographical limit and expired after approximately five years, was implemented at least in part as a result of a study indicating that although the general population of Richmond was 50% black only 0.67% of the prime construction contracts in the five preceding years had gone to MBEs.

In its strict scrutiny analysis the Court began by distinguishing *Fullilove,* emphasizing that Congress' power arising out of the remedial mandate of § 5 of the Fourteenth Amendment was one of affirmative enforcement whereas § 1 of the Fourteenth Amendment was a constraint on the power of the states to discriminate. Thus, the Court rejected the argument that the states enjoyed the same freedom as Congress to legislate to remedy the effects of past discrimination. *Id.* at 491, 100 S.Ct. 2758. The Court concluded, however, that, within certain limits, the State was free to legislate to remedy the effects of its own discriminatory practices even if its malfeasance was in the form of "passive participant" in racial discrimination within the construction industry. *Id.* at 492, 100 S.Ct. 2758.

Addressing the factual basis for Richmond's finding that past racial discrimination justified its set-aside program the Court rejected Richmond's "[r]eliance on the disparity between the number of prime contracts awarded to minority firms and the minority population of the city of Richmond." *Id.* at 501, 100 S.Ct. 2758. In that regard the Court stated:

> standing alone this evidence is not probative of any discrimination in the local construction industry. There are numerous explanations for this dearth of minority participation, including past societal discrimination in education and economic opportunities as well as both black and white career and entrepreneurial choices.

*Id.* at 503, 100 S.Ct. 2758. Despite the statistical disparities the Court specifically noted that:

> the city has not ascertained how many minority enterprises are present in the local construction market nor the level of

their participation in city construction projects. The city points to no evidence that qualified minority contractors have been passed over for city contracts or subcontracts, either as a group or in any individual case. Under such circumstances, it is simply impossible to say that the city has demonstrated "a strong basis in evidence for its conclusion that remedial action was necessary."

*Id.* at 510, 100 S.Ct. 2758. Thus, there "was no direct evidence of race discrimination on the part of the city in letting contracts or any evidence that the city's prime contractors had discriminated against minority-owned subcontractors." *Id.* at 480, 100 S.Ct. 2758.[9]

In addressing whether the plan was narrowly tailored the Court observed that many of the barriers to minority representation in city contracts were race neutral, including a lack of capital, employees and size and/or an inability to meet bonding requirements, and noted that there did not appear to have been any consideration of race neutral means to raise minority participation in such contracts such as relaxed bonding requirements, simplification of bidding procedures and training and/or financial aid for minority business owners. *Id.* at 509–10, 100 S.Ct. 2758. Thus, the plan was deemed not to be narrowly tailored to remedy the effects of past discrimination.

The Sixth Circuit followed in *Aiken v. City of Memphis,* 37 F.3d 1155 (6th Cir.1994), with a holding that a policy of racially based promotions within the Memphis police and fire departments was unconstitutional. There the court advised that while it is the ultimate burden of the plaintiff to prove that an affirmative action plan is unconstitutional "the party defending the plan bears the burden of producing evidence that the plan is constitutional." *Id.* at 1162.

The promotion policy in that case failed the second prong of the strict scrutiny analysis because, despite the city's commitment fifteen years earlier to finding a valid, non-racially based method of promoting as an alternative to race-based relief, no attempt had been made to create or implement such procedures. The court found that the failure to do so suggested that the racially based promotion procedures served a political, rather than remedial, purpose and precluded a finding that the promotion plan was narrowly tailored. *Id.* at 1164.

Again the Supreme Court stepped into the arena, and after having made the distinction in power between Congress and the States in *Croson* essentially removed the distinction in *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) when it ruled that Congress should be held to the same strict scrutiny standard as the States in enacting race conscious legislation. In so holding the Court overruled *Fullilove* to the extent that it "held federal racial classifications to be subject to a less rigorous standard" than strict scrutiny, and made clear that federal racial classifications were to be subjected to the same rigorous strict scrutiny standards applied to the state and local governments. *Id.* at 234, 115 S.Ct. 2097.[10]

The Sixth Circuit incorporated the preceding Supreme Court cases in *Middleton v. City of Flint, Michigan,* 92 F.3d 396 (6th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1552, 137 L.Ed.2d 700 (1997) in which the city of Flint was found not to have met its "heavy" burden of demonstrating the existence of a compelling interest in a plan requiring that 50% of all police officers promoted to the rank of sergeant be members of minority groups.

---

**9.** The Court went on to caution that its analysis of the evidence concerning past discrimination applied only to black business owners and that there was absolutely no suggestion in the record that there was past discrimination against the other designated "minorities" affected by the legislation, to wit; Spanish-speaking. Oriental, Indian, Eskimo, or Aleut persons, thereby rendering the legislation grossly over inclusive as it was entirely possible that Richmond simply did not have any citizens falling into those racial groups, much less have a history of discrimination against them.

**10.** The Court thus rejected its earlier decision in *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) wherein the federal government was held to a more relaxed standard of intermediate scrutiny when employing "benign" racial classifications. *Adarand,* 515 U.S. at 227, 115 S.Ct. 2097.

The court found that judicial findings of discrimination prior to 1973 did not justify the promotion policy because later courts had found that the efforts by the city of Flint to rectify that situation had been largely successful. Anecdotal evidence of discrimination was likewise found insufficient because, although it may have evidenced individual instances of discrimination, it did not show systemic discriminatory practices. Finally, the court found the statistical evidence wanting stating:

> we hold that a disparity between the percentage of a protected class employed in a particular workforce or occupation and the raw percentage of class members in a regional labor pool, standing alone, cannot be "a strong basis in evidence" sufficient to justify hiring or promotion quotas. That is, it is permissible to remedy *discrimination*. It is not permissible to remedy *disparity*, without more.

*Id.* at 406.

The court then went on to the issue of narrow tailoring, finding that the existence of less onerous alternatives was evident by the fact that such alternatives had been effectively employed by the city in preceding years. Moreover, although the plan ostensibly had some flexibility built into it to avoid promotion of unqualified minorities it was, in fact, effectuated in an inflexible way. As to the duration of the plan the court noted that it had been in effect too long, approximately nine years, found that the disparity of minorities to nonminorities in the workplace had already evolved into near parity, and held that further denial of promotions to otherwise eligible white applicants was a burden too heavy to satisfy the narrow tailoring requirement.

With this background in mind this Court turns to the set-aside plans at issue herein.

■ As a preliminary matter this Court must consider the issue of what governmental entity is to be looked to for evidence of past discrimination——the State of Ohio or CCC itself.

■ Although it is well-established that the past discrimination which establishes the compelling interest in affirmative action must have been by a governmental entity seeking to employ the affirmative action plan, it is not entirely clear to this Court that this means that a history of discrimination in the area of public construction contracts by the State of Ohio might not be considered sufficient to justify the use of a set-aside program by an arm of the State, CCC, without a showing of discrimination by that particularized entity.

On the other hand, it seems apparent to this Court that CCC should no more be required to remedy the discriminatory practices of other departments of the state than should a municipal fire department be required to remedy discriminatory hiring practices of a police department in the same municipality. Similarly, an MBE could not sue CCC for discriminatory contracting customs of the Ohio Department of Transportation. Allowing an arm of the State which has not been found to have discriminated in the past to remedy a history of discrimination by the State itself would be tantamount to requiring it to remedy broad societal discrimination, which would be an exercise in the tail wagging the dog.

This Court, therefore, concludes that the relevant governmental entity is CCC.[11] *See, Brunet v. City of Columbus,* 1 F.3d 390, 404 (6th Cir.1993), *cert. denied,* 510 U.S. 1164, 114 S.Ct. 1190, 127 L.Ed.2d 540 (1994) (discrimination within the fire department necessary for there to exist a compelling interest in implementing an affirmative action plan within that department.).

Having so found, however, this Court recognizes that the CCC set-aside program was mandated by, and largely patterned after State statutes. Thus, the constitutionality of those enactments is indirectly at issue, to the extent that they could establish the requisite findings of past discrimination by CCC required to demonstrate the existence of a

---

11. Defendants essentially ignore the issue altogether and base their defense almost entirely on the alleged constitutionality of the underlying state statutes. As the flaws in Defendants' arguments relate to the state statutes as well as the CCC policies this Court shall address them as presented with respect to both entities.

compelling interest in remedying such discrimination.

█ Addressing first the compelling purpose prong of the strict scrutiny analysis Plaintiff maintains that "Defendants do not have any evidence (let alone a 'strong basis' in evidence) which demonstrates a significant statistical disparity between the number of qualified minority of female owned contractors willing and able to perform a particular service and the number of such contractors actually engaged by [CCC] or [CCC's] prime contractors."

In response, Defendants, while conceding that there have been no studies specifically addressing past discrimination with respect to the current state legislation and/or CCC policies, argue that there is conclusive evidence that such substantiation exists because the Sixth Circuit has approved similar legislation in the past, specifically, in the *Contractors Association v. Keip* case.

This Court disagrees with Defendants' position for several reasons.

First, as the previously discussed cases illustrate Defendants' reliance on *Keip* is misplaced because *Keip* was not decided under the strict scrutiny standard applied post-*Wygant*.[12]

█ More importantly, even if *Keip* could be said to have applied the correct standard the evidence relied upon by that court in finding that there existed past discrimination which justified racial classifications (the 1967 and 1979 cases and the study ending in 1975) is not relevant to the present case and cannot justify CCC's MBE policies enacted in 1994 because those materials are too remote in time to establish the compelling interest. It is beyond dispute that discrimination has occurred in the past in almost every area of endeavor, and if past discrimination unrelated to present effects was sufficient to meet the compelling interest prong of the strict scrutiny test no affirmative action plan would fail. *See, Brunet*, 1 F.3d at 409 (evidence of discrimination prior

to 1975 too remote to justify affirmative action plan implemented in 1989.). Unless the statistics relied upon by the court in *Keip* were the same in 1996 when the present action arose as they were in 1983 when *Keip* was decided those earlier statistics are irrelevant, as they simply do not tell this Court what it needs to know. The proper question is whether past discrimination by the governmental entity seeking to establish the affirmative action plan is the direct cause of present day injury which is amenable to remediation.

Defendants also contend that CCC was permitted to rely on the Ohio legislature which enacted the statutes upon which its policy was based and which issued a directive that the community colleges apply the set-aside program in their contracts. In so arguing Defendants do not attempt to demonstrate that there was a sufficient legal basis for the state's set-aside legislation found at O.R.C. § 123.151 and, in fact, specifically disavow any knowledge of the background to that legislation, stating that neither their expert nor Plaintiff's expert was "requested to investigate the statistics or studies upon which this statute was based and neither researched the evidence preceding its adoption." Rather, Defendants argue that this Court must presume the constitutionality of the state statute and, therefore, must presume the constitutionality of the CCC policies enacted in accordance with it.

█ While it is true that, in general, state laws are entitled to a presumption of validity, "[n]ot all legislation, ... is entitled to the same presumption of validity. The presumption is not present when a State has enacted legislation whose purpose or effect is to create classes based upon racial criteria, since racial classifications, in a constitutional sense, are inherently 'suspect.'" *Parham v. Hughes*, 441 U.S. 347, 351, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979). Therefore, Defendants cannot rely on the mere existence of state law to justify CCC's racially based policy as

---

**12.** Defendant argues that because the court in *Keip* used the word "compelling" in its discussion of the need for remedial legislation it applied the strict scrutiny standard. Upon a thorough reading of that case, however, it is abundantly clear that the court, while not specifying the standard used, did not apply strict standard precepts.

the state statutes upon which it is based do not enjoy a presumption of validity.

Defendants next contend that, although it is not known upon what basis the State of Ohio decided that a minority set-aside program was necessary, the existence of a compelling basis for the challenged set-aside program is evidenced by two private studies by A.D. Jackson Consultants, Inc. in 1991 and 1992. Those studies were commissioned by five public entities,[13] not including CCC, in order to address the legal and constitutional sufficiency of their MBE and FBE programs in light of *Croson.*[14] Defendants assert that the studies provide evidence of discrimination against MBEs by State, County, and Municipal entities as they demonstrate that minority firms receive 46.6% fewer contract dollars than they would if contracts were awarded in the same proportion that minority firms are found in the relevant area.

This argument suffers from several deficiencies.

■ First, Plaintiffs correctly point out that the studies are not authenticated by anyone with personal knowledge and, thus, are inadmissible hearsay.

Such inadmissibility, however, does not necessarily preclude the use of their information and conclusions by Defendants' expert, as Rule 703 of the Federal Rules of Evidence provides that an expert may rely on reports or studies which are themselves inadmissible so long as they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subjects." Assuming without deciding that the Jackson Studies are the type of studies reasonably relied on by experts in the field of past discrimination. (insofar as "past discrimination" could be termed a "field") this Court turns to the report of Dr. Ian Ayres whom Defendants have designated as their expert witness. The value of Dr. Ayres' report is severely limited by its scope which he describes as follows: "I was hired specifically to comment on the report of the plaintiff's expert witness, Professor George LaNoue.[15] I was not asked to validate current or past practices for allocating construction contracts by the Cuyahoga Community College District."

With this caveat in mind Dr. Ayres addressed the Jackson reports, finding that they are not conclusive of the need for remedial action to ameliorate the effects of past discrimination on the part of CCC. In summarizing his opinion as to the significance of the Jackson reports Dr. Ayres states that "[t]he Jackson studies could not survive strict-scrutiny review under *Croson* because they do not adequately measure the availability of minority firms and because they do not allow for a narrowly-tailored remedy for whatever underutilization is found." Dr. Ayres points out that the Jackson studies "are based on a crude 'head-counting' method which assumes that if MBEs are X percent of all firms, they should receive X percent of all contracts." This method of study fails to take into account the fact that MBEs tend to be smaller firms which are not necessarily qualified to handle public construction contracts. Although noting that the size of MBE firms may itself be due to discrimination Dr. Ayres acknowledges that "reverse-causation from discrimination to variables such as firm age and size is a difficult problem that has no accepted solution in the economics profession, either as a matter of theory or empiricism." Moreover, such reverse-causation is more than likely the result of societal discrimination which may have delayed the development of MBE firms thereby rendering them unqualified for bigger jobs and skewing statistics to show disparity between large and small firms as dis-

13. Those entities are the City of Cleveland, the Cuyahoga County Government, the Cleveland Public Schools, the Northeast Ohio Regional Sewer District, and the Northeast Ohio Areawide Coordinating Agency on behalf of the Regional Transit Authority.

14. Although the studies were conducted prior to CCC's policy enactments it is not alleged that

CCC relied on those studies in its decision to adopt them.

15. Professor LaNoue's report is essentially a legal brief discussing case law and, as such, provides little information from which this Court could assess the factual background of the legislation or policies challenged herein.

parity between minority and non-minority firms.

In short, while the Jackson studies indicate the existence of disparity based upon raw numbers of MBEs in proportion to all contractors and their respective percentage of public contracts, they are not dispositive of the issue of past racial discrimination, particularly by CCC which did not take part in the studies.[16] The studies do not show MBEs qualified and willing to undertake CCC construction contracts but instead rely solely on disparity between all MBEs and the distribution of contract dollars to show discrimination, a mode of analysis rejected in *Middleton*, 92 F.3d at 406. Thus, Defendants have failed to demonstrate a compelling need for CCC's policies either by reason of past discrimination in the construction industry by CCC or by the State of Ohio within the area from which CCC is likely to acquire contractors.

■ If the policies could be said to be supported by a compelling interest the second prong of the strict scrutiny analysis signals their death knell, as this Court finds that they are not narrowly tailored.

Plaintiff maintains that CCC's MBE policy does not meet any of the criteria for establishing that it is narrowly tailored. Because there are no statistics showing how many MBEs are qualified and willing to undertake CCC's construction contracts, and no correlating studies showing how many of them receive such contracts or the percentage of the value of such contracts which go to MBEs, there is no relation between the scope of the injury and the extent of the remedy. Plaintiff further contends that the policies are fatally flawed because no race-neutral alternatives were considered the policies are enforced inflexibly and are of unlimited duration and geographic scope, and no showing of actual economic disadvantage need be made by an MBE in order to benefit from them.

Again, Defendants rely almost exclusively on the Sixth Circuit's decision in *Keip* for their assertion that the policies at issue have been definitively determined to be narrowly tailored. For the reasons expressed above that reliance is, again, misplaced. The evidence of past discrimination relied on in *Keip*, besides being too remote for evidentiary value in this case, is not specific to the relevant market area of CCC. Also, the court in *Keip*, following its interpretation of *Fullilove*, did not apply the "narrowly tailored" prong of the strict scrutiny analysis as it has evolved in the succeeding years, specifically rejecting the argument that before enacting a set-aside program the legislature must consider alternative remedies and ensure flexibility and limited duration. Moreover, the fact that in 1983 the Sixth Circuit found that 7% of MBE participation was an appropriate remedy for past discrimination could not be said to establish that a 10% participation policy is narrowly tailored fifteen years later.

There is no evidence that CCC or the State of Ohio considered any race neutral alternatives to the set-aside program, nor is there a time limit placed on the MBE set-aside program which has been in place since 1982. Moreover, there is no requirement in CCC's policy, which applies to several minority groups without specific findings of discrimination as to each, that in order to benefit from the program any MBE must demonstrate that it has been the victim of past discrimination or that it is otherwise

---

16. In this regard Dr. Ayres equivocates to some extent stating:

Although CCC was not one of the sponsoring agencies for the Jackson Studies the Studies' conclusions are relevant to CCC for 3 reasons. First, the studies focused on a geographic market—defined as the Cleveland PMSA—that is roughly the same as the one in which CCC operates. Hence, the studies' conclusions about the availability of MBEs to the sponsoring agencies apply equally to CCC. Second, the sponsoring agencies are all public institutions whose demand for goods and services is roughly similar to CCC's. Although I have not been provided with procurement data for CCC, its spending pattern across the 7 SIC codes may have been similar to that of the sponsoring agencies. Third both CCC and the 5 agencies that participated in the Jackson study have an interest in remedying whatever *private* discrimination or underutilization has occurred within the same geographic/political area—the Cleveland PMSA, as I discuss below.

economically disadvantaged.[17] For these reasons CCC's MBE policy is not narrowly tailored.

The discussion thus far has revolved around CCC's MBE policy. However, Plaintiff's challenge goes to the FBE program as well. In commending that Plaintiff should not be granted judgment on that policy Defendants simply argue that because Plaintiff was not denied the contract due to failure to meet the FBE participation percentage it does not have standing to challenge that aspect of the set-aside program.

In order to have standing to seek forward looking relief the plaintiff must show "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). A discriminatory classification which prevents a plaintiff from competing on equal footing constitutes a concrete and particularized injury. *Adarand*, 515 U.S. at 211, 115 S.Ct. 2097. "[I]n the context of affirmative action programs, the challenger need only show that, but for the program, he would have been considered for the job, to satisfy standing requirements." *Brunet v. City of Columbus*, 1 F.3d 390, 397 (6th Cir. 1993).

The FBE set-aside program clearly prevents Plaintiff from competing on equal footing. Nevertheless, it is undisputed that Plaintiff was not denied the contract due to that aspect of Defendant's affirmative action program and Plaintiff has not offered evidence that in the future it is likely to seek a construction contract with CCC and be denied such contract for failure to satisfy the FBE policy. Therefore, Plaintiff has not presented evidence that its legally protected interest in competing on an equal footing is in imminent danger of being trampled.[18]

Based on the foregoing this Court concludes that CCC's MBE policy is unconstitutional and grants Plaintiff partial summary judgment with respect to that issue, and denies Plaintiff's motion with respect to the FBE policy.[19]

**IT IS SO ORDERED.**

---

17. To the extent that the underlying state set-aside statutes fail to require a showing of actual social or economic disadvantage by the MBE seeking to benefit from them at least one state appellate court has declared them unconstitutional. *Ritchey Produce Company, Inc. v. Ohio*, 1997 WL 629965 (Ct.App.Ohio 1997), *appeal allowed*, 81 Ohio St.3d 1445, 690 N.E.2d 16 (1998).

18. If Plaintiff had made the requisite showing of imminent harm this Court is convinced that under the present record, CCC's FBE program would likewise fail. There is absolutely no evidence in the record to indicate that FBEs have been discriminated against in the past with respect to CCC or State of Ohio construction contracts. No information is presented indicating how many qualified FBEs exist in the relevant area how many have sought and been refused contracts, or how many contract dollars they receive. Nor is evidence presented to indicate that non-gender related remedies for any discrimination against FBEs were ever considered.

19. Plaintiff's assertion that "absent a national emergency involving the War Powers under Articles I and II of the Constitution ... does not ever permit a state, or a political subdivision thereof, to discrimination [the basis of race]" is patently frivolous in light of Supreme Court rulings within the past fifty years and does not merit discussion.